NOTICE
This Order was filed under
Supreme Court Rule 23 and is not
precedent except in the limited
circumstances allowed under Rule
23(e)(1).

2021 IL App (4th) 190046-U

NO. 4-19-0046

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 22, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| ISIS M. HEATH, | ) | No. 17CF1144 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

---

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court reversed and remanded where defendant was prejudiced by
trial counsel's ineffective assistance during plea negotiations.

¶ 2    In August 2017, the State charged defendant, Isis Heath, by information with one

count of home invasion, a Class X felony (720 ILCS 5/19-6(a)(2) (West 2016)), following an

incident at the home of Jasmine Lenard. Prior to trial, defendant, on two occasions, declined the

State's plea offers. On November 28, 2018, the jury found defendant guilty of home invasion.

On December 28, 2018, defendant filed a motion for judgment notwithstanding the verdict or,

alternatively, for a new trial. On January 2, 2019, the trial court denied defendant's motion and

sentenced defendant to six years in the Illinois Department of Corrections to be served at 85%.

¶ 3    Defendant appeals, arguing trial counsel was ineffective where counsel failed to request and review video evidence of her statements to police and then failed to advise her to accept the State's offer.  For the following reasons, we reverse and remand.

¶ 4                              I. BACKGROUND

¶ 5    On August 20, 2017, defendant went to the home of Jasmine Lenard to locate Rodney Tolbert, a man she was dating, who was in Lenard's home.  Ultimately, defendant kicked in the door to Lenard's home, went inside, and attacked Lenard.  Eventually, Tolbert forced defendant out of the house.  Lenard reported the home invasion to police who immediately responded.  After being forced out of Lenard's home, defendant went to her home, placed a 4:45 a.m. call to police to report a theft from her by Tolbert, and when questioned by police at her home, denied any involvement in the attack at Lenard's home.  Following their initial contact with defendant, officers determined they needed to do some additional investigation.  After further investigation, defendant was arrested on August 22, 2017, and charged with home invasion.

¶ 6                          A. Pretrial Negotiations

¶ 7    During pretrial negotiations, the State offered to allow defendant to enter an open plea to the Class 4 felony criminal trespass to residence, a crime for which defendant was extended term eligible.  Defendant declined to accept the offer.  About a week before trial, the State offered to allow defendant to enter an open plea to the Class 3 felony aggravated battery involving great bodily harm, also a crime for which defendant was extended term eligible. Again, defendant declined to accept the offer.  Before starting defendant's jury trial, the trial court confirmed defendant was aware of the pretrial offers made by the State.  Defendant indicated she was aware of the offers and intended to proceed with a jury trial.

¶ 8                                B. Jury Trial

¶ 9        In November 2018, the circuit court held defendant's jury trial on the home invasion charge. During the State's case-in-chief, defense counsel objected to the admission of video evidence showing defendant being interviewed at her home following the incident at Lenard's residence. Defense counsel claimed the State failed to disclose and forward the video to him. Eventually, it was determined that video along with video from a prior traffic stop involving defendant, and video capturing defendant's interview at the Champaign County Sheriff's Department, were sent to defense counsel approximately three weeks before trial. Ultimately, defense counsel conceded the videos were sent but maintained he never received them. After the court took a recess to allow defense counsel and his client to review the video evidence, the trial continued, and the video evidence from the interviews and still shots from video of the traffic stop involving defendant were admitted without objection.

¶ 10       During the trial, the State offered the testimony of the following individuals: (1) Jasmine Lenard; (2) Champaign County Sheriff's Deputy Robert Derouchie; (3) Champaign County Sheriff's Deputy Cory Christensen; (4) Champaign County Sheriff's Investigator Chad Carlson; (5) Illinois State Police Forensic Science Laboratory forensic scientist Rhonda Carter; and (6) Illinois State Police Forensic Science Laboratory forensic biologist Dan Pitchford. The State also presented multiple exhibits including the previously mentioned video of defendant being interviewed at her home and at the sheriff's department and still shots taken from video of a traffic stop involving defendant on August 19, 2017. Defendant testified on her own behalf and presented photographs showing her with Lenard, her with Tolbert, and photos depicting Lenard's children and her children together. Below, we set forth the trial evidence relevant to the issue on appeal.

¶ 11 Jasmine Lenard testified that in August 2017, she lived at 1120 West Bradley in Champaign, Illinois. On August 19, 2017, Lenard and her romantic partner, Rodney Tolbert, ended the night at her house after closing down a couple of bars downtown. In the early morning hours of August 20, around 4 a.m., she and Tolbert were in bed when Lenard awoke to defendant yelling and banging on Lenard's bedroom window. Lenard described her relationship with defendant as acquaintances. In August 2017, defendant lived down the street from Lenard, about a block away. Previously, the two attended high school together, and their children were connected by mutual families. However, at no point were they close friends. They were friends on Facebook and had each other's cell phone numbers. Although Lenard was unaware of the nature of the relationship between defendant and Tolbert when the incident at her home occurred, she did know defendant and Tolbert were previously engaged in a romantic relationship.

¶ 12 Prior to arriving at Lenard's home, defendant made numerous calls to Tolbert, messaged Lenard on Facebook, and called Lenard's cell phone multiple times. When defendant started banging on the window, Lenard and Tolbert got up and started getting dressed because Tolbert decided to leave, and Lenard planned to lock the door behind him. However, by the time they started making it to the front, defendant "kicked the door in and come into the house and attacked me." Due to it being dark in the house, Lenard was unable to see what defendant used to attack her. Lenard sustained a cut to her face, an injury to her eye, and cuts to her head and back. Although Lenard tried to defend herself, she only managed to push defendant, and at no point was she able to strike or punch defendant. Eventually, Tolbert separated the two women and Lenard went to the kitchen to retrieve a knife. When Lenard returned to the front, defendant was at the door engaged in a struggle with Tolbert and trying to get back into the house. While

Tolbert tried to keep defendant out, Lenard called the police. Tolbert was able to keep defendant out, and after a bit, defendant ran to her cousin's car and they pulled off.

¶ 13　　　　　Shortly after defendant left, the police arrived and found Lenard and Tolbert at Lenard's home. In Lenard's home, the officer found a red acrylic fingernail in the area where defendant attacked her. Lenard told officers neither she nor Tolbert wore acrylic fingernails. She also indicated the fingernail had not been in her house before the attack. The police also spoke with Lenard after Lenard, accompanied by Tolbert, went to the hospital for treatment. Lenard received six stitches to repair the cut to her face, three staples to repair a cut to her head, and three stiches in each of the two cuts on her back. When defendant cut Lenard's face, she cut Lenard's "nasal cord," causing blood to drain into Lenard's stomach. Lenard described suffering frequent vomiting for approximately a month as a result of the blood drainage. Lenard testified she told police defendant did not have permission to be in her home when this incident occurred and that she was sure it was defendant who broke in and attacked her. Unlike Lenard, Tolbert declined to make a statement to police while at Lenard's home or the hospital.

¶ 14　　　　　Champaign County Sheriff's Deputy Robert Derouchie testified that on August 20, 2017, at approximately 4:42 a.m., he responded to a call for assistance at the residence of Jasmine Lenard. When he arrived, "it looked like the front door of the residence had been forced open. There were pieces of wood, part of the door frame on the ground inside the residence. I saw blood droplets on the pieces of broken wood on the floor in the living room and then also in the kitchen area." He spoke with Jasmine Lenard and Rodney Tolbert. Lenard was upset and excited, and he noticed a cut underneath her left eye. Lenard was cooperative and gave a statement. Tolbert declined to give a statement. While working the scene, Derouchie found a red acrylic fingernail on the floor in the living room ten to twelve feet from the front door. He

seized the fingernail, placed it in a sealed evidence bag, and when he returned to the sheriff's department, locked the evidence in secure evidence storage.

¶ 15     After speaking with Lenard and Tolbert at the scene, Deputy Derouchie made contact with defendant at her residence. Champaign County Sheriff's Deputy Christensen and Champaign County Sheriff's Deputy Vercler were also present at defendant's home. All three officers wore body cameras which recorded their interactions with defendant. Without objection, the trial court admitted the video showing the officers' initial interview of defendant. The video was played for the jury. Deputy Derouchie described the various interactions shown on the video. Defendant had no injuries, bleeding, or bruising and never complained of any injuries. Defendant denied any involvement in the incident at Lenard's residence and repeatedly told officers she had been home the entire time. When asked if she wore acrylic nails, defendant claimed she previously wore acrylic nails but took them off two days earlier. When officers questioned defendant about being pulled over by police the night before the incident at Lenard's home and whether the officer's body cam video from that stop would show her with red fingernails, defendant "swore to God" she took them off two days ago. Deputy Derouchie testified that upon leaving defendant's residence to conduct further investigation, he reviewed video from the traffic stop and confirmed defendant was wearing red acrylic fingernails.

¶ 16     Once he discovered defendant did wear red acrylic fingernails during her traffic stop, Deputy Derouchie returned to defendant's residence, arrested her, and transported her to the Champaign County jail. After being advised of her *Miranda* rights, defendant agreed to speak with Deputy Derouchie. Without objection, the video capturing Derouchie's Champaign County jail interview of the defendant was admitted and played for the jury. Deputy Derouchie testified that during the interview, defendant continued to deny being present during the incident at

Lenard's home. When Deputy Derouchie asked defendant "how sure are you that you won't have DNA on that," referring to the red fingernail he found at Lenard's home, defendant responded, "a hundred."

¶ 17          Champaign County Sheriff's Deputy Cory Christensen testified he initiated a traffic stop pursuant to an Illinois Vehicle Code violation on August 19, 2017, where defendant was the driver of the vehicle stopped. Rodney Tolbert was the passenger. Deputy Christensen identified video from the traffic stop as well as three still images produced from the traffic stop video showing defendant with long red acrylic fingernails. The traffic stop video and the still images were admitted without objection.

¶ 18          Champaign County Sheriff's Investigator Chad Carlson testified that in December 2017, he collected deoxyribonucleic acid (DNA) evidence from the defendant in compliance with a court order. Investigator Carlson described using a buccal swab to gather cells from the defendant. After swabbing the inside of defendant's cheeks with sterile cotton swabs, Investigator Carlson "packaged them into an envelope, sealed them up with evidence tape, labeled it and secured it into the evidence locker at the Sheriff's Office." The envelope remained in the secure evidence locker until it was submitted to the Illinois State Police Crime Laboratory.

¶ 19          Rhonda Carter, a forensic scientist with the Illinois State Police, was accepted by the court as an expert in the field of forensic DNA analysis. Carter testified that when evidence is submitted to the State Police Forensic Science Laboratory, a secure facility, the evidence is inventoried and then put into a secured vault specifically for items anticipated to undergo biology and DNA analysis. Only individuals in the biology DNA unit have access to the vault. Carter testified the Champaign County Sheriff's Department submitted a DNA sample from defendant and the red acrylic fingernail to the lab. Carter described for the jury the scientific process she

undertook to extract and preserve any DNA located on the red acrylic fingernail. Carter testified that after extracting the DNA, she placed the cotton swab she used in extracting the DNA in a tube and placed the tube into a secure vault for eventual comparison to the DNA sample from defendant. During cross-examination, Carter agreed the lab also received a buccal swab DNA sample from Jasmine Lenard.

¶ 20        Dana Pitchford, a forensic biologist specializing in the screening of biological evidence and DNA analysis, employed by the Illinois State Police Forensic Science Laboratory was accepted by the court as an expert in the field of forensic DNA analysis. Pitchford described for the jury the scientific process she used to try to compare the DNA extracted from the red acrylic fingernail to the DNA sample from defendant and the DNA sample from Lenard. The DNA profile on the red acrylic fingernail was determined to be a mixture of three people. Pitchford found one major DNA profile and at least two minor DNA profiles on the red acrylic fingernail. The minor profiles were at such low levels that they were not suitable for making any comparisons. However, the major DNA profile could be compared. Pitchford identified defendant as a contributor to the major DNA profile located on the red acrylic fingernail. Pitchford determined the major DNA profile found on the red acrylic fingernail would show up 1 in 430 quadrillion times in the general unrelated population. Pitchford indicated defendant was consistent with that 1 in 430 quadrillion. Pitchford testified Lenard was excluded from the major profile found on the red fingernail. After confirming all of the State's exhibits had been admitted, the State rested.

¶ 21        After representing to the trial court she had spoken with her counsel about whether or not she should testify, defendant elected to take the stand. Defendant also knew about the trial court's prior ruling authorizing the State to impeach her on rebuttal with

admission of her prior felony conviction for theft in Champaign County case No. 13-CF-420 and obstructing justice in Champaign County case No. 13-CF-1271.

¶ 22            According to defendant, as of August 2017, she and Rodney had been in a romantic relationship for three-and-a-half years. Defendant described Lenard as a good friend with whom she cooked, participated in weekly movie nights, and spoke on the phone. Defendant testified that prior to the incident, she and Lenard were friends on Facebook and Snapchat whose children frequently played together. When this incident occurred, they lived on the same street, about a block apart, and saw each other every day. Defendant identified photographs showing her with Lenard, her with Tolbert, and photos depicting Lenard's children and her children together. The photographs were admitted over the objection of the State.

¶ 23            On Sunday, August 20, 2017, defendant watched a video clip on Snapchat showing Lenard and Tolbert in a vehicle together listening to a sexually suggestive song. In the video, Lenard is smoking, and Tolbert is drinking. Calls defendant made to Tolbert and Lenard upon seeing the Snapchat video clip went unanswered. To no avail, she also attempted to reach Lenard via the Facebook Messenger app. Eventually, defendant walked to Lenard's house and knocked on the side door. When Lenard failed to open the side door, defendant knocked on the bedroom window. After hearing sounds, but getting no response, defendant went to the front door and knocked. During the approximately three minutes she was outside knocking, defendant repeatedly called Tolbert's name.

¶ 24            Defendant testified that shortly after she began knocking on the front door, Tolbert, fully dressed, opened the front door. Defendant walked in and began arguing with Tolbert when she saw Lenard, who was naked, come around the corner yelling at her. Then, Tolbert grabbed defendant, and Lenard reached around Tolbert and hit defendant in the face.

- 9 -

After Tolbert let her go or she got loose, defendant and Lenard began fighting. Defendant denied having a knife or a weapon and disavowed stabbing Lenard. Defendant testified she did not inflict the wounds on Lenard's face and scalp. Eventually, Tolbert separated the two women, and Lenard indicated she was going to retrieve a knife. At that point, Tolbert pushed defendant out the door and exited with her. Defendant related that once she and Tolbert were outside, she and Tolbert engaged in a physical fight.

¶ 25 Defendant testified her cousin drove by Lenard's home while she and Tolbert were outside fighting. Defendant stopped fighting Tolbert and walked to her cousin's vehicle while threatening to call the police on Tolbert. Defendant described how Tolbert approached her and grabbed her phone and her keys. Defendant then went home and called the police and reported Tolbert took her keys and cell phone from her home.

¶ 26 Defendant admitted she was wearing red acrylic fingernails when the incident occurred and agreed the two videos of her being interviewed by the police, which were admitted into evidence and shown to the jury, showed her repeatedly lying to police. She conceded that, in the interview at her home, she lied by denying ever going to Lenard's home on the day in question and claiming she was not wearing red acrylic nails on the day in question. She also confessed to continuing to lie as shown in the video capturing her interview at the Champaign County jail which showed she continued to deny any involvement and claimed her DNA would not be on any fingernail found at Lenard's home. Furthermore, defendant admitted the still images produced from the traffic stop the night before the incident confirmed she lied to police when she indicated she was not wearing red acrylic fingernails when she was stopped by Deputy Christensen. Following defendant's testimony, the trial court advised the jury of defendant's

theft conviction in Champaign County case No. 13-CF-420 and her obstructing justice conviction in Champaign County case No. 13-CF-1271.

¶ 27        Both attorneys made closing arguments to the jury. During the State's closing argument, the prosecutor made extensive use of the video from defendant's first contact with officers at her home, the video of her interview at the Champaign County jail, and still images produced from video during defendant's traffic stop the night before the incident at Lenard's home. Playing no less than five clips from the videos, and using the still images, the prosecutor pointed out defendant's repeated lies and deceptions throughout the authorities' investigation of the incident. Defense counsel admitted defendant had not been forthright but argued defendant entered Lenard's home with permission. Defense counsel maintained the evidence showed that at the time defendant was allowed entry into Lenard's home, defendant had no intention of getting into an altercation with Lenard. After an instruction conference between the court, counsel, and defendant, the court instructed the jury. Ultimately, the jury returned a verdict of guilty on the Class X felony of home invasion.

¶ 28                        C. Posttrial Proceedings

¶ 29        On January 2, 2019, counsel for defendant filed an amended posttrial motion for judgment notwithstanding verdict or, alternatively, for a new trial. In the amended posttrial motion, counsel alleged, in part: (1) defendant was severely prejudiced by the State's late disclosure of evidence, in that defendant's counsel received information regarding three separate pieces of videotaped evidence during the course of the trial; (2) counsel for defendant had no time to prepare for proper evidence review, cross-examination of witnesses, or discussion with defendant regarding whether to go forward with the trial at all; (3) counsel for defendant was also rendered ineffective during extensive plea negotiations with the State prior to trial. Never

- 11 -

once were the videos presented, mentioned, or offered to defendant for review; (4) had defendant and counsel been permitted to review this video evidence in the months prior, when this case was set for trial the first of three times, counsel could have better advised defendant and she could have made better informed decisions during plea negotiations and trial preparations; and (5) defendant avers had she known the contents and nature of all the evidence against her, she would have accepted the State's plea offer. During a January 2, 2019, hearing on defendants posttrial motion, the State strenuously objected to the posttrial motion where timely disclosed police reports were replete with references to the events being captured on body cameras. The State also pointed out that defendant personally participated in both interviews and the traffic stop captured on video. Thus, the State argued "it would be almost impossible for the defense not to have been acutely aware of the body cameras in this case." In response, defense counsel asserted, "So here it is, Isis Heath, has an offer on the table for a Class 4 felony. She turns it down based on me not being able to tell her what she was dealing with, and she goes to trial on a Class X felony." In closing, defense counsel stated, "so yes, I'm asking—if we can't—if we can't take this back, let this young lady plead out to what the offer was."

¶ 30        In denying defendant's posttrial motion, the trial court stated:

    "Well, again reviewing the evidence in the case, the disks, the two disks in
    question was first of all an interview with the defendant outside her home the
    night of the offense where she steadfastly denied any involvement, and then a
    subsequent interview while in custody where again she denied any involvement.
    The affidavit signed by the first assistant indicates that on November 5 of this
    year, some three weeks prior to trial, the various disks were sent to Mr. Ivy. The
    disk should have been sent to Mr. Ivy pursuant to the discovery order that was

entered last year, but they weren't. They came late. They still came three weeks

prior to trial.

The defendant again was admonished prior to trial, based upon the offer

from the State, that she declined the offer, which would've been a plea to open on

one of two, one or the other Class 3 or Class 4 felonies for open sentencing, and

she chose to go to trial.

Again the video basically showed the defendant, in her interactions with

the police, denying that she did anything, denying that she committed the offense.

Again the discovery was late. It eventually got there, and I don't believe that

there is anything as a result of that that would require this court to grant the

post-trial motion."

¶ 31        After ruling on the posttrial motion, the trial court immediately proceeded to

sentencing. At the State's request, the trial court made a posttrial determination as to whether or

not defendant caused great bodily harm in committing the home invasion. The prosecutor noted

that in the event great bodily harm was caused, defendant would be required to serve eighty-five

percent of any sentence imposed. 730 ILCS 5/3-6-3(a)(2)(iii) (West 2016). The court

determined, "[g]iven the number of puncture wounds and the nature of those wounds, especially

the one to her face beneath her eye, this was great bodily harm." Ultimately, the trial court

sentenced defendant to six years in the Illinois Department of Corrections.

¶ 32        This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34        On appeal, defendant argues she was prejudiced by trial counsel's ineffective

assistance during plea negotiations where counsel failed to request and review video evidence of

Heath's statements to police and then failed to advise her to accept the State's plea offer for an open plea to the Class 4 criminal trespass to property. In response, the State concedes trial counsel provided ineffective assistance. However, the State argues defendant suffered no prejudice.

¶ 35        Under both the United States and Illinois constitutions, a defendant has the right to effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15, 996 N.E.2d 607; U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. In *People v. Curry*, our supreme court recognized that the right to effective assistance of counsel applied to plea negotiations. *People v. Curry*, 178 Ill. 2d 509, 528, 687 N.E.2d 877, 887 (1997). The right to effective assistance of counsel extends to the decision to reject a plea offer, even if defendant subsequently receives a fair trial. *Id.* at 518. Claims of ineffective assistance of counsel in the plea-bargaining process are governed by the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, defendant must show deficient performance and resulting prejudice. *Id.* at 687. We review such claims *de novo*. *Hale*, 2013 IL 113140, ¶ 15.

¶ 36        Here, defense counsel admitted during trial and at the hearing on his posttrial motion, that prior to trial, he did not review the video evidence in question and neglected to advise defendant to take any plea offer. Moreover, in his posttrial motion, counsel represented that defendant would have taken a prior plea offer if she had been aware of the contents and nature of the evidence against her. Thus, we accept the State's concession and examine whether defendant demonstrates prejudice.

¶ 37        A defendant is prejudiced by counsel's deficiency in plea-bargaining if there is a reasonable probability that, absent his trial counsel's deficient advice, he would have accepted the State's plea offer. *Curry*, 178 Ill. 2d at 529-30. "This showing of prejudice must encompass

more than a defendant's own subjective self-serving testimony." (Internal quotation marks omitted.) *Hale*, 2013 IL 113140, ¶ 18. Instead, there must be "independent, objective confirmation that defendant's rejection of the proffered plea was based upon counsel's erroneous advice, and not *** upon other considerations." *Curry*, 178 Ill. 2d at 532. The disparity between the sentence a defendant faced and a significantly shorter plea offer can be considered supportive of a defendant's claim of prejudice. *Id.* at 533. In addition, defendant must demonstrate there existed "a reasonable probability that the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law." (Emphasis and internal quotation marks omitted.) *Hale*, 2013 IL 113140, ¶ 19. Finally, defendant must show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time. *Id.*

¶ 38        Considering the factors relevant to this inquiry, we find defendant has demonstrated prejudice. In this instance, defendant faced a single count, the non-probationable Class X felony home invasion. A Class X felony carries a possible penalty of 6 to 30 years' imprisonment. 730 ILCS 5/5-4.5-25) (West 2016). Moreover, in the event the trial court made a finding of great bodily harm, which it did here, defendant would serve her sentence at 85%. 730 ILCS 5/3-6-3(a)(2)(iii) (West 2016). In contrast, pursuant to the plea agreements offered to defendant, defendant faced an open plea to an extended term eligible Class 3 or 4 felony with the home invasion charge being dismissed. Thus, if defendant accepted one of the State's plea offers, she faced a minimum of one to six years and a maximum of two to eight years in the Illinois Department of Corrections, served at 50%, in the event the trial court denied probation.

¶ 39 Defendant's averment that "had she known the contents and nature of all the evidence against her, she would have accepted the State's plea offer" is bolstered by defense counsel's representation during the hearing on the posttrial motion where he stated "so here it is, Isis Heath has an offer on the table for a Class 4 felony. She turns it down based on me not being able to tell what she was dealing with, and she goes to trial on a Class X felony." Here, defendant rejected multiple offers. Moreover, defendant went to trial without the benefit of a full appreciation of the strength and potential impact of the video evidence. Even worse, defense counsel's failures robbed defendant of sound advice from counsel who has reviewed the evidence and is equipped to effectively assist defendant during plea negotiations.

¶ 40 According to the State, the record fails to support defendant's prejudice claim. Specifically, the State points out defendant rejected multiple plea offers, including on the day of trial, counsel received police reports containing multiple references to the video evidence, and counsel ultimately received the video evidence prior to trial. Frankly, the State's argument misses the point. Defendant rejected the State's offers under circumstances where neither she nor her counsel had the opportunity to review the video evidence. If defense counsel had reviewed the evidence, counsel would have advised defendant to accept the State's offer. Moreover, defendant would have accepted the offer and entered a plea to a lesser charge with a less onerous penalty than required upon conviction of the charge on which she went to trial.

¶ 41 In addition, absent is any indication in the record suggesting the State would have cancelled the plea. Also, given the trial court's inquiry into pretrial offers on the day of trial, we find the trial court would have accepted the plea agreement. We also note the trial court imposed the minimum sentence allowed on a Class X felony. Even so, in the end, defendant received a conviction on a Class X felony and a six-year sentence which she must serve at 85%. Clearly, if

defendant had accepted the State's offer, she would have had the opportunity to enter plea to a lesser charge, seek probation, and serve any prison sentence imposed at 50%. Thus, defendant has made the necessary showing of prejudice.

¶ 42　　　　Finally, we must determine the proper remedy in this instance. According to defendant, we should remand the matter for resumption of plea negotiations. In this instance, we find the United States Supreme Court decision in *Lafler v. Cooper* instructive. In *Lafler*, the court found ineffective assistance of counsel caused the rejection of a plea, leading to a trial resulting in a conviction on more serious charges and the imposition of a more severe sentence. *Lafler v. Cooper*, 566 U.S. 156, 167-68 (2012). According to *Lafler*, "[t]he correct remedy in these circumstances, however, is to order the State to reoffer the plea agreement. Presuming respondent accepts the offer, the state trial court can then exercise its discretion in determining whether to vacate the convictions and resentence respondent pursuant to the plea agreement, to vacate only some of the convictions and resentence respondent accordingly, or to leave the convictions and sentence from trial undisturbed." *Id.* at 174.

¶ 43　　　　In accordance with *Lafler*, we order the State to reoffer defendant an open plea to the extended term eligible Class 4 felony criminal trespass to residence. Presuming defendant accepts the offer, the trial court can then exercise its discretion in determining whether to vacate the conviction and resentence defendant pursuant to the plea agreement or to leave the conviction and sentence from trial undisturbed.

¶ 44　　　　　　　　　　　　　III. CONCLUSION

¶ 45　　　　For the reasons stated, we reverse the trial court's judgment and remand the case for further proceedings consistent with this order.

¶ 46　　　　Reversed and remanded with directions.